

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00361-CR

Anthony John **SEQUIERA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 7, Bexar County, Texas
Trial Court No. 445586
Honorable Genie Wright, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  July 29, 2015

AFFIRMED AS MODIFIED

Anthony John Sequiera was found guilty of the offense of terroristic threat of a family/household member and was sentenced to a year in jail, a $1,500.00 fine, and court costs. The trial court also made an affirmative finding of family violence. Sequiera brings six issues on appeal: (1) the evidence was insufficient to support his conviction for making a terroristic threat; (2) the trial court erred in allowing testimony about Sequiera's post-threat possession of firearms; (3) the trial court erred in allowing testimony about Sequiera's post-threat use or possession of marijuana; (4) the trial court's cumulative errors constituted harmful error; (5) the trial court erred

in denying Sequiera's request for the lesser-included offense of disorderly conduct to be included in the jury charge; and (6) the trial court erred by orally pronouncing a sentence of time served and then, without Sequiera being present, sentencing him to a year in jail in the written judgment. Because we agree the trial court erred in its written judgment, we modify the judgment and affirm as modified.

## BACKGROUND

At trial, Donna Colleen Guzman, the receptionist at an elementary school in Alamo Heights, testified that on December 11, 2013, at about 2:30 p.m., she received a call from Bailey Fabre, the older sister of B.[1] Fabre told Guzman that Sequiera, B.'s father, was going to attempt to pick up B. from the school but that it was not his designated day to pick her up. Fabre asked that B. not be allowed to go outside after school ended for the day. Guzman testified that she contacted B.'s fourth grade teacher and asked her to send B. to the main office. According to Guzman, about five minutes after she received the phone call from Fabre, Sequiera entered the main office. Guzman testified that Sequiera was friendly and said he was there to pick up B. Guzman told him that she could not release B. to him because it was not his day to pick up B. from school. Guzman testified that Claudia Chancellor, B.'s mother, then came into the office and walked up behind Sequiera. Guzman then looked outside the office window and saw B. walking in the hallway toward the office. When B. entered the office, Sequiera told B. to come to him. Guzman testified that she told B. not to go to her father. Guzman then ushered B. to the back of the office. According to Guzman, Chancellor and Sequiera started arguing. Sequiera said, "It's going to be like that? You're going to be like that?" Chancellor replied, "Yeah," and started to walk down the stairs to go outside. Guzman testified that from Sequiera's body language, she could tell he was angry.

---

[1] Because B. is a minor, we refer to her by her first initial.

Sequiera followed Chancellor closely. Guzman then saw them arguing outside. Chancellor then came back inside and asked to speak to the principal and vice principal. Guzman testified that she did not hear Sequiera threaten Chancellor.

Bailey Fabre, the twenty-year-old daughter of Chancellor and B.'s older sister, testified that Sequiera was her former stepfather. Earlier in the day on December 11, 2013, her mother had received many text messages from Sequiera that had deeply concerned her mother. Sequiera had texted her mother that he was going to pick up B. from school. According to Fabre, as she and her mother were on their way to pick up B., she called the school and asked for B. to be held inside the school and not released to Sequiera. When Chancellor parked the car in the oval driveway at the entrance of the school, Fabre saw Sequiera running toward her and Chancellor. Sequiera said, "No, No, No, you don't want to mess with me. You don't know what you're doing. Get the fuck out of here. Don't fuck with me." Fabre testified that she was frightened and immediately called the police. Chancellor started walking towards the door to the school and Sequiera "just kept getting in front of her, but he didn't want to touch her, but he just kept threatening her." "He finally he was just, like, 'I'm going to kill you.'" "He just got so frustrated and just said it." "And then he just – you know, he kept saying, 'Don't fuck with me. Don't fuck with me.'" Fabre testified that she heard Sequiera tell Chancellor that she had had B. all this week and that it was his turn. Fabre testified that Chancellor did not stop, did not say anything, and kept walking toward the door of the school. According to Fabre, when Sequiera left the building, he yelled, "Peace," and held up a peace sign. As Sequiera was leaving he waved the Bible he had in his hand to everybody he passed and said, "God bless you." As soon as he got to the street, he ran toward the street in the same direction he had come from. Fabre testified that Sequiera was in the building a very short time and that the police arrived about five minutes after she called them. Fabre testified that as she was

speaking with the officers, her mother, Chancellor, saw Sequiera driving his car on the street and pointed the car out to the officers.

Chancellor testified that Sequiera had been texting her the morning of December 11, 2013, and "was in a bad state of mind." According to Chancellor, she received a total of forty-three text messages. Chancellor responded only once. Chancellor testified that Sequiera texted he was going to pick up B. from school. When Chancellor arrived at the school, Sequiera approached her car and appeared to be "very angry." According to Chancellor, Sequiera said, "Are you fucking kidding? You get my daughter, I'm going to kill you." Chancellor testified that she was "scared, very scared, but . . . wanted to get to [her] daughter, and . . . wanted to make sure that she stayed in the office." Chancellor testified, "I was afraid he might hurt me. He was very close and his hands were going up and down. I knew he owned shotguns. He prides himself on saying he always has weapons." As Chancellor walked toward the office, Sequiera continued talking and screaming at her. Sequiera then crossed in front of her, opened the door to the main office, and went in first. Sequiera attempted to sign out B., but the receptionist told him that it was not his day. According to Chancellor, Sequiera then said, "Is this what you want? Is this what you want? Is this what you want? Are you fucking kidding me?" Chancellor testified that Sequiera then left the school. She estimated the entire encounter took about ten minutes.

Officer Jordan Hosey of the Alamo Heights Police Department testified that on December 11, 2013, he got a call relating to a disturbance at an elementary school. He and Sergeant Lyle Key arrived at the school about a minute after receiving the call. They looked for the suspect for about ten to fifteen minutes and when they could not locate him, they began talking with Fabre and Chancellor who told them about Sequiera making the threat to kill Chancellor. As the officers were talking with Fabre and Chancellor, Sequiera drove past the school. Chancellor pointed him out to the officers who then got back into their patrol car to pursue Sequiera. They then stopped

Sequiera's car and arrested Sequiera. According to Sergeant Key, when they stopped Sequiera's car, his window was rolled down. As Sergeant Key approached, he could smell a strong odor of marijuana coming from inside the car. The officers then searched the car and found a fully loaded semi-automatic handgun, a semi-automatic shotgun, and some marijuana.

After hearing all the evidence, the jury found Sequiera guilty of terroristic threat.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Sequiera argues the evidence is legally insufficient to support his conviction for terroristic threat of the family/household because there is no evidence to show he intended to place Chancellor in fear of imminent serious bodily injury. When reviewing legal sufficiency, we view all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

Section 22.07(a)(2) of the Texas Penal Code provides that a person commits the offense of terroristic threat "if he threatens to commit any offense involving violence to any person or property with intent to . . . place any person in fear of imminent serious bodily injury." TEX. PENAL CODE ANN. § 22.07(a)(2) (West 2011). If the offense "is committed against a member of the person's family or household or otherwise constitutes family violence," the punishment range is enhanced to a Class B misdemeanor. *Id.* § 22.07(c)(1).

"Imminent" means "[n]ear at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (quoting BLACK'S LAW DICTIONARY 676 (5th ed. 1979)); *see also Williams v. State*, 432 S.W.3d 450, 454 (Tex. App.—San Antonio 2014, pet.

ref'd). The accused's threat of violence, made with the intent to place the victim in fear of imminent serious bodily injury, is what constitutes the offense. *Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. [Panel Op.] 1982). "Once the defendant makes a threat to commit a violent offense seeking the 'desired reaction to place a person in fear of imminent serious bodily injury,' the offense of terroristic threat is completed." *Williams*, 432 S.W.3d at 454 (quoting *Dues*, 634 S.W.2d at 306). "It is not necessary for the victim to actually be placed in fear of imminent serious bodily injury or for the accused to have the capability or the intention to actually carry out the threat." *Williams v. State*, 194 S.W.3d 568, 574-75 (Tex. App.—Houston [14th Dist.] 2006), *aff'd on other grounds*, 252 S.W.3d 353 (Tex. Crim. App. 2008). Although a victim need not actually be placed in fear of imminent serious bodily injury, "[t]he desired and sought after reaction of the victim, regardless of whether the threat was real or was carried out, is some evidence of the defendant's intent to place the victim in fear of imminent serious injury." *Id.* at 575. Further, the requisite intent can be inferred from the acts, words, and conduct of the accused. *Id.* (citing *Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980)).

Sequiera argues there is no evidence that he intended to place Chancellor in fear of imminent serious bodily injury. He points to Fabre's testimony that he seemed "frustrated" after he issued the threat to kill Chancellor, and Fabre's characterization of him on the day in question as "anxious," "surprised," and "nervous." He points to Guzman's description of him as "friendly" and Fabre's account of him leaving the school holding up a peace sign. According to Sequiera, "[n]one of that sounds like a person intending to put Ms. Chancellor in imminent fear of serious bodily injury."

However, there was also testimony from Guzman, Fabre, and Chancellor that Sequiera was angry. Guzman testified that when Sequiera and Chancellor began fighting in the school office and Chancellor turned to walk down the stairs, "Sequiera walked up behind her like kind of like almost

'lording' over her in a way." When asked to explain what "lording" meant in that context, Guzman replied, "[w]hen you're going down the stairs, if someone's taking the stairs at the same time as you, it's almost like a body check." Fabre testified that when she and Chancellor arrived at the school, Sequiera approached them in an aggressive manner and that when Chancellor started walking to the school, Chancellor kept getting in front of Chancellor and hovering over her. Fabre was so concerned about Sequiera's behavior that she immediately called the police. Chancellor testified that when she arrived at the school, Sequiera began cursing and threatening her. As she walked toward the school office, Sequiera was screaming at her and was very aggressive; he was very close to her and his hands were going up and down. Chancellor testified that she knew he owned guns and that he "pride[d] himself on saying he always has weapons." Chancellor testified that she believed he would harm her and believed he was capable of harming and even killing her.

In reviewing all the evidence in the light most favorable to the verdict, a rational jury could have found that Sequiera intended to place Chancellor in fear of serious bodily injury. Sequiera emphasizes that there was no testimony that he had a weapon at the school at the time of the incident. However, it is not necessary that Sequiera actually had the intention to carry out the threat. *See Dues*, 634 S.W.2d at 305. The offense was completed if Sequiera, by his threat to kill Chancellor, sought as a desired reaction, to place Chancellor in fear of imminent serious bodily injury. A rational jury could infer from all the evidence that Sequiera intended to place Chancellor in fear of imminent serious bodily injury. We therefore hold that the evidence is sufficient to support Sequiera's conviction and overrule his first issue.

### ADMISSION OF EVIDENCE

In his second, third, and fourth issues, Sequiera complains that the trial court erred in allowing testimony from the officers about the guns and marijuana found inside his car because

such testimony was irrelevant. *See* TEX. R. EVID. 401. He argues that the cumulative effect of these two errors requires reversal of his conviction.

The State concedes that the trial court erred in allowing testimony regarding Sequiera's use or possession of marijuana before the jury; however, it argues that such error was harmless. With regard to the testimony about guns being found in Sequiera's car, the State argues that such evidence was relevant to "the issue of his intent." Alternatively, the State argues that even if the admission of evidence relating to the guns being found in his car was in error, such error was harmless. As noted, the Texas Court of Criminal Appeals has explained that "it is immaterial to the offense [of terroristic threat] whether the accused had the capability or the intention to carry out his threat." *Dues*, 634 S.W.2d at 305. If it is immaterial whether Sequiera had the capability or the intention of carrying out his threat, it is difficult to see how the possession of guns in his car found after the alleged offense was relevant. Nevertheless, we agree with the State that any error in the admission of such evidence was harmless.

Because the erroneous admission of irrelevant evidence is non-constitutional error, we do not reverse a conviction unless the error affected a "substantial right[]." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *see Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002) (explaining that for claims of non-constitutional error, "a conviction should not be overturned unless, after examining the record as a whole, a court concludes that an error may have had 'substantial influence' on the outcome of the proceeding").

With regard to guns being found in Sequiera's car, Sequiera's attorney was able to elicit testimony from the officers that the guns were not the only objects found in his car. Sergeant Key testified that Sequiera told him that he was in the process of moving into an apartment near the

elementary school. According to Sergeant Key, Chancellor also said Sequiera was moving into the area near the school. Sergeant Key confirmed that there were "a lot of items inside the car," "almost as if he was moving." Sergeant Key characterized these items as personal effects, clothes, and small appliances. He also testified that a person may legally transport his weapons from one location to another if he is moving and that such items should be concealed. Thus, Sequiera's attorney was able to elicit evidence of an alternate explanation for guns being found in Sequiera's car.

With regard to the marijuana evidence, during closing argument, Sequiera's attorney explained to the jury that Sequiera having marijuana in his car had nothing to do with the case. The State then responded in its closing argument, agreeing that the marijuana evidence was irrelevant:

> Again, so much distraction on different stuff. Protective order – you're right, we're not here for a protective order case. We're not here for possession of a firearm case or a possession of marijuana case. *Quite frankly, those don't matter*. Because both of them told you whether it was his day or not, whether there was a protective order in place or not does not give him the right – does not give anybody the right to threaten somebody's life.

(emphasis added).

Looking at the entire record as a whole, we cannot conclude that the admission of the evidence pertaining to guns and marijuana being found in Sequiera's car had a "substantial influence" on the outcome of the trial or affected Sequiera's substantial rights. *See Burnett*, 88 S.W.3d at 637; *see also* TEX. R. APP. P. 44.2(b). We therefore overrule Sequiera's second, third, and fourth issues.

### JURY CHARGE

In his fifth issue, Sequiera argues that the trial court erred when it denied his request for the lesser-included offense of disorderly conduct to be included in the jury charge. A defendant is

entitled to the submission of a lesser-included offense if a two-pronged test is met: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Solomon v. State*, 49 S.W.3d 356, 368-69 (Tex. Crim. App. 2001).

An offense is a lesser-included offense if "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged."[2] TEX. CODE CRIM. PROC. ANN. art. 37.09(1) (West 2006). To determine whether an offense qualifies as a lesser-included offense under this definition, a court uses the cognate-pleadings approach. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). Under this approach, an offense is a lesser-included offense of another offense if the indictment for the greater-inclusive offense either (1) "alleges all of the elements of the lesser-included offense," or (2) "alleges elements plus facts (including descriptive averments, such as non-statutory manner and means, that are alleged for purposes of providing notice) from which all the elements of the lesser-included offense may be deduced." *Id.* (quoting *Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009)). "Both statutory elements and any descriptive averments alleged in the indictment for the greater-inclusive offense should be compared to the statutory elements of the lesser offense." *Id.* at 383. "If a descriptive averment in the indictment for the greater offense is identical to an element of the lesser offense, or if an element of the lesser offense may be deduced from a descriptive averment in the indictment for the greater-inclusive offense, this should be factored into the lesser-included offense analysis in

---

[2] An offense is also a lesser-included offense if "it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission"; "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission"; or "it consists of an attempt to commit the offense charged or an otherwise included offense." TEX. CODE CRIM. PROC. ANN. art. 37.09 (2)-(4) (West 2006).

asking whether all of the elements of the lesser offense are contained within the allegations of the greater offense." *Id.* The "elements of the lesser-included offense do not have to be pleaded in the indictment if they can be deduced from facts alleged in the indictment." *Id.* "In this situation, the functional-equivalence concept may be part of the lesser-included-offense analysis." *Id.* "Using functional-equivalence, the court must examine the elements of the lesser offense and decide whether they are functionally the same or less than those required to prove the charged offense." *Id.* (citations omitted).

Sequiera was prosecuted under section 22.07(a)(2) of the Texas Penal Code, which provides that a person commits the offense of terroristic threat "if he threatens to commit any offense involving violence to any person or property with intent to place any person in fear of imminent serious bodily injury." TEX. PENAL CODE ANN. § 22.07(a)(2) (West 2011). The information charged Sequiera with the following:

> on or about the 11 day of December 2013, Anthony John Sequiera, hereinafter referred to as defendant, did threaten to commit an offense involving violence to Claudia Helena Chancellor, to wit: defendant threatened serious bodily injury or death to Claudia Helena Chancellor, with intent to place Chaudia Helena Chancellor in fear of imminent serious bodily injury.

Sequiera requested the lesser-included offense of disorderly conduct be submitted to the jury based on two subsections of the disorderly conduct statute: subsections 42.01(a)(1) and (a)(4). Under these subsections, a person commits an offense if he intentionally or knowingly "uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace" or "abuses or threatens a person in a public place in an obviously offensive manner." TEX. PENAL CODE ANN. § 42.01(a)(1), (4) (West Supp. 2014). In comparing the offense of terroristic threat as charged in the information with disorderly conduct, disorderly conduct requires proof of an additional element that terroristic threat does not: that is,

disorderly conduct requires proof of "a public place." Thus, the offense of disorderly conduct is not a lesser-included offense of terroristic threat as alleged in this case.

**SENTENCE**

In his sixth issue, Sequiera argues that the trial court violated his due process rights by sentencing him to a fine and term of imprisonment outside his presence. The State concedes that the trial court erred in its judgment.

At the sentencing hearing, the trial court asked the State for a recommendation, and the State replied that Sequiera should be sentenced to "a $1,500 fine, court costs, one year in the Bexar County jail, time and money to run concurrent, credit for time served and an affirmative finding of family violence." The trial court then asked how long Sequiera had been in jail. Sequiera's counsel replied, "About 45 days, Judge." The trial court then asked the State what was happening on his other pending cases. The prosecutor replied that she did not know. The trial court then stated, "I'm j-sating[3] this case since he's going to remain in jail on the other [cases still pending]." Thus, the trial court orally pronounced a sentence of forty-five days in jail, time served. However, the trial court's written judgment sentenced Sequiera to "a fine of $1,500 and court costs of $457.00 and 1 yr in jail" with an "affirmative finding of family violence." Sequiera argues that the trial court's oral pronouncement of sentence controls, and we should modify the judgment to strike the fine and affirmative finding of family violence, and the time of imprisonment should be modified to forty-five days. We agree.

A defendant is entitled to be present when his sentence is pronounced. *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002). "A trial court's pronouncement of sentence is oral, while the judgment, including the sentence assessed, is merely the written declaration and

---

[3] "J-sating" is a reference to "judgment satisfied."

embodiment of that oral pronouncement." *Id.* "The rationale for this rule is that the imposition of sentence is the crucial moment when all of the parties are physically present at the sentencing hearing and able to hear and respond to the imposition of sentence." *Id.* "Once he leaves the courtroom, the defendant begins serving the sentence imposed." *Id.* "Thus, 'it is the pronouncement of sentence that is the appealable event, and the written sentence or order simply memorializes it and should comport therewith.'" *Id.* (quoting *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)). "A trial court does not have the statutory authority or discretion to orally pronounce one sentence in front of the defendant, but enter a different sentence in his written judgment, outside the defendant's presence." *Id.* at 136. "A defendant has a due process 'legitimate expectation' that the sentence he heard orally pronounced in the courtroom is the same sentence that he will be required to serve." *Id.* Therefore, "[w]hen there is a conflict between the oral pronouncement of sentence and the sentence in the written judgment, the oral pronouncement controls." *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004).

We therefore modify the trial court's judgment to delete the $1,500 fine and affirmative finding of family violence, and to modify the time of imprisonment to forty-five days. *See id.* (holding that the appellate court correctly deleted the fine from the judgment because at the time of oral pronouncement, the trial court did not orally pronounce a fine but only included it in the written judgment). We affirm the judgment as modified.

Karen Angelini, Justice

Do not publish